UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN VERRILLI, LOUIS CAFIERO, and TREVOR GORDON, <br><br>                Plaintiffs,<br>  – against –<br><br>THE NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION NO. 2N/1SE, JOHN HEFFERNAN, and RICHARD DALY,<br><br>                Defendants. | **MEMORANDUM & ORDER**<br>16-CV-5172 |

**Appearances**

**For Plaintiffs:**                    David George Gabor
                                            The Wagner Law Group
                                            99 Summer Street
                                            13th Floor
                                            Boston, MA 02110

**For Defendants:**                  Dana E Lossia
                                            Daniel Engelstein
                                            Levy Ratner, P.C.
                                            80 Eighth Avenue
                                            New York, NY 10011-5126

**JACK B. WEINSTEIN, Senior United States District Judge:**

## Table of Contents

I. Introduction ........................................................................................................... 1
II. Facts ...................................................................................................................... 2
    A. Shaping ..................................................................................................... 3
    B. Union Membership .................................................................................. 4
    C. Instant Litigation ...................................................................................... 5
III. Law ....................................................................................................................... 6
    D. Standard of Review ................................................................................. 6
    E. Statute of Limitations on Duty of Fair Representation Claim ................. 6
IV. Application of Law to Facts ................................................................................. 7
    A. Duty of Fair Representation ..................................................................... 7
    B. State Law Claims .................................................................................... 12
V. Conclusion .......................................................................................................... 13

## I. Introduction

Plaintiffs worked as non-permanent non-union printing press employees for the New York Times (the "Times"). They claim that a 2015 amendment to the collective bargaining agreement between the Times and the New York Newspaper Printing Pressmen's Union No. 2N/1SE (the "Union") adversely affected non-Union employees' wages and violated the Union's duty of fair representation for them.

The applicable six-month statute of limitations for filing a claim began to run when plaintiffs knew or should reasonably have known of changes to the agreement. Defendants have moved to dismiss for failure to timely file their claim. Plaintiffs respond that they were unaware of the amendment until at least eight months after its ratification, so that their suit was timely brought.

The motion to dismiss is granted. Plaintiffs knew or reasonably should have known of the amendment immediately following its ratification: their wages decreased and notice of the changes had been made public in the pressroom and in the public media.

The statute of limitations bars this suit, so the court need not address defendants' lack of standing claim. Plaintiffs rely on tolling of the statute because they did not know their rights were being violated.

The court sympathizes with these worker-plaintiffs who have lost much of their income because of technological and economic change in their trade – operating print pressrooms of newspapers. But, they took no steps to find out if their rights (if any) to be represented in negotiations between the Times and the Union on behalf of its own membership (which did not include plaintiffs) were being violated.

See nothing, hear nothing, and do nothing to protect your rights is generally discouraged under our law. The American civil justice system expects vigilant and effective oversight and protection of personal legal rights and timely action to protect them. "A court . . . has always refused its aid to stale demands, where the party has slept upon his rights." *Piatt v. Vattier*, 34 U.S. 405, 416 (1835) (internal quotation marks and citation omitted).

## II. Facts

Plaintiffs John Verrilli, Louis Cafiero, and Trevor Gordon worked for the Times as non-Union employees ("Casuals"). Compl., Sept. 14, 2016, ECF No. 1 ("Compl."), at ¶ 6. The primary printing facility for the Times is located in Queens. It is staffed by the Union. Defs.' Rule 56.1 Statement of Facts, Mar. 30, 2017, ECF No. 23 ("Defs.' Rule 56.1 Statement"), at ¶¶ 1, 12; Pls.' Rule 56.1 Statement of Facts, Apr. 10, 2017, ECF No. 28 ("Pls.' Rule 56.1 Statement"), at ¶¶ 1, 12. The Union and the Times are parties to a collective bargaining agreement ("CBA"), which governs the wage scale and compensation of Union and non-Union employees. Defs.' Rule 56.1

Statement at ¶¶ 17, 20. The named defendants are Union officials: John Heffernan is the President and lead negotiator and Richard Daly is the Secretary Treasurer. *Id.* at ¶¶ 2-3; Pls.' Rule 56.1 Statement at ¶¶ 2-3.

Plaintiff Verrilli began working as a Casual for the Times in 1996, plaintiff Cafiero began in 1997, and plaintiff Gordon began in 2003. Compl. at ¶¶ 22-26. They have always worked as Casuals: Verrilli and Cafiero have never joined the Union; Gordon joined the Union in 2016 but remained a Casual. *Id.* at ¶¶ 16, 23, 25, 27-29; Pls.' Rule 56.1 Statement at ¶¶ 76-78.

### A. Shaping

Employees in the Times' pressroom are divided into several classifications: Journeymen (or "Pressmen"), Junior Apprentices (or "Apprentices"), and Casuals. Compl. at ¶ 39. Journeymen have the most seniority and are granted a priority in receiving work assignments. *Id.* at ¶ 40. When Casuals are selected for work, they receive assignments similar to those of Apprentices. *Id.* at ¶ 41. Work is assigned by seniority: Union members receive work first, and when Journeymen or Apprentices are unavailable, the Times selects Casuals to meet staffing needs. *Id.* at ¶¶ 41-47. The Times maintains a list of all Casuals. Once a Casual has worked a requisite number of shifts per year, he or she will be removed from the Casuals list, placed on a priority list, and become eligible for Union membership. *Id.* at ¶ 49.

The priority lists rank individuals by seniority based on the date the Casual began appearing for shifts at the Times and the number of times he has worked a shift. *Id.* at ¶¶ 48-53. Casuals are typically not informed in advance whether they will be selected to work a shift. In order to receive work, they report to the pressroom and are informed by the Union foreman in a shape-up shortly before the start of a shift whether an open spot is available. If Casuals are not selected for a shift, they do not work and do not receive compensation. This "shaping" is repeated until a Casual has

worked the requisite number of shifts to be moved from the Casual list to the priority list and receives an offer of Union membership. *Id.* at ¶¶ 53-62.

Plaintiffs allege that the Union actively prevented them from becoming Union members by ensuring that they were unable to work the requisite number of shifts. *Id.* at ¶¶ 62-95. According to plaintiffs, the Union deliberately recruited Union members stationed at other presses – such as the New York Daily News and the New York Post – to shape at the Times. Because these members had priority over Casuals based on their general Union membership, they were regularly assigned available shifts. This tactic is known as "flooding the shop." Plaintiffs allege it was used whenever it became apparent that a Times Casual was approaching the number of shifts needed to become a Union member, preventing membership. *Id.*

### B. Union Membership

Union members, whose employment is governed by the CBA, have the right to select their Union leaders, negotiate their terms of employment under the CBA, and vote on CBA amendments. *Id.* at ¶¶ 33-36. Casuals do not enjoy any of these rights. The terms of their employment and compensation are dictated by the agreement between the Times and the Union. *Id.* at ¶¶ 37-38.

The CBA between the Times and the Union has been amended several times, most recently in 2015, 2008, 2004, and 1997. Defs.' Rule 56.1 Statement at ¶ 19; Pls.' Rule 56.1 Statement at ¶ 19. Whenever an amendment to the CBA is negotiated, the Union assembles a bargaining committee led by the Union's President. Defs.' Rule 56.1 Statement at ¶ 21. Any tentative agreement reached in collective bargaining between the Union and the Times is submitted to the whole Union membership for a ratification vote. *Id.* at ¶ 22. Pursuant to the Union's bylaws, any tentative agreement reached between the Union's bargaining committee and the Times must be posted in the pressroom for at least seven days preceding a ratification vote. *Id.* at ¶ 23. This

practice was followed with each amendment negotiated between 1997 and 2015. *Id.* at ¶ 24. *See also* Decl. of John Heffernan, Mar. 28, 2017, ECF No. 24 ("Heffernan Decl."), at ¶ 3.

On September 28, 2015, the Times and the Union signed a Memorandum of Agreement ("MOA") that extended the CBA – which was set to expire in March 2017 – to March 2021. Defs.' Rule 56.1 Statement at ¶¶ 25, 28. The MOA was ratified by the members of the Union on October 5, 2015. *Id.* at ¶ 26. It created three wage tiers: Tier 1 applied to employees who were Pressmen at the Times when the MOA was ratified. Tier 2 applied to employees who met certain experience levels when the MOA was ratified. Tier 3 applied to all other employees, including Casuals who did not meet the Tier 2 experience levels when the MOA was ratified. *Id.* at ¶ 36; Heffernan Decl. at Exhibit 4(h), Art. XI(a). Plaintiffs were assigned to Tier 3 following the ratification of the MOA, reducing their daily compensation from approximately $250 to $350 per shift to approximately $150 per shift. Defs.' Rule 56.1 Statement at ¶ 37; Pls.' Rule 56.1 Statement at ¶ 37; Compl. at ¶¶ 120-135; June 6 Hr'g Tr. at 39:9-11. The MOA also eliminated an incentive plan for meeting production targets and replaced it with a $25,000 bonus Tier 1 employees would receive upon ratification. Defs.' Rule 56.1 Statement at ¶ 38. These changes in compensation took effect on October 5, 2015. *Id.* at ¶ 40.

### C. Instant Litigation

In September 2016, plaintiffs initiated the instant suit, alleging that the Union breached its duty of fair representation by ratifying a discriminatory and disproportionate tiered wage structure under which plaintiffs' wages were significantly reduced. *See generally* Compl.

Defendants filed a motion to dismiss the complaint on the pleadings. The motion was denied at a hearing on January 31, 2017. *See* Hr'g Tr., Jan. 31, 2017. Leave to file a motion for summary judgment was granted on the limited question of whether the action was brought in a timely manner. *Id.*; *see also* Scheduling Order, Jan. 31, 2017, ECF No. 16.

In March 2017, defendants filed a joint motion for summary judgment on the ground that the six-month statute of limitations on duty of fair representation claims barred plaintiffs' suit. *See* Defs.' Mot. for Summ. J., Mar. 30, 2017, ECF No. 21.

## III. Law

### D. Standard of Review

Summary judgment is appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party, resolving all ambiguities and drawing all reasonable inferences against the movant." *Hernandez v. Int'l Shoppes, LLC*, 100 F. Supp. 3d 232, 247 (E.D.N.Y. 2015), *appeal dismissed* (June 18, 2015). The substantive law governing the case will identify those facts that are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

No genuinely triable factual issue exists "if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). If the movant meets this burden, the non-moving party must provide "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks and citation omitted).

### E. Statute of Limitations on Duty of Fair Representation Claim

An employee's claim against a union for breaching its duty of fair representation to him or her is a cause of action "implied under the scheme" of the National Labor Relations Act ("NLRA"),

6

29 U.S.C. §§ 151-169. *See Kalyanaram v. Am. Ass'n of Univ. Professors at N.Y. Inst. of Tech., Inc.*, 742 F.3d 42, 46 (2d Cir. 2014); *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164 & n.14 (1983). "It is undisputed that the limitations period for filing such a claim in the district court is borrowed from section 10(b) of the NLRA, 29 U.S.C. § 160(b), which provides for a six-month limitations period." *Kalyanaram*, 742 F.3d at 46; *DelCostello*, 462 U.S. at 169; *see also Demchik v. Gen. Motors Corp.,* 821 F.2d 102, 105 (2d Cir. 1987).

"In this circuit, it is well settled that the cause of action accrues no later than the time when plaintiffs *knew* or reasonably *should have known* that such a breach of the duty of fair representation had occurred, even if some possibility of nonjudicial enforcement remained." *Kalyanaram*, 742 F.3d at 46 (emphasis in original) (quoting *Cohen v. Flushing Hosp. & Med. Ctr.,* 68 F.3d 64, 67 (2d Cir. 1995)); *see also Scerba v. Allied Pilots Ass'n*, 589 F. App'x 554, 558 (2d Cir. 2014) ("[R]atification of an allegedly violative agreement is the latest date on which the statute of limitations for a duty of fair representation claim can begin to run." (internal quotation marks and citation omitted)).

## IV. Application of Law to Facts

### A. Duty of Fair Representation

Because plaintiffs filed their complaint in September 2016 their claims must have accrued in or after March 2016 to be timely. *Kalyanaram*, 742 F.3d at 46; *DelCostello*, 462 U.S. at 164 & n.14.

According to defendants, plaintiffs became aware of the changes to the CBA as soon as the MOA had been concluded. In accordance with the Union's bylaws, a copy of the MOA was posted on several bulletin boards in the pressroom starting on September 28, 2015 through the end of the calendar year. Defs.' Rule 56.1 Statement at ¶¶ 29-31; Mem. of Law in Supp. of Defs.' Mot. for Summ. J., Mar. 30, 2017, ECF No. 22 ("Defs.' Summ. J. Mem."), at 5. Copies of the MOA were

7

passed out in the pressroom on September 29, 2015 and October 5, 2015. Defs.' Rule 56.1 Statement at ¶¶ 33-34; Defs.' Summ. J. Mem. at 6. The Union distributed these copies freely, and did not collect them after they had been read. Defs.' Rule 56.1 Statement at ¶ 35; Defs.' Summ. J. Mem. at 6.

The Union's President periodically issues reports to the membership of the Union, which were posted in the pressrooms of all of the newspapers within the Union's jurisdiction. In September 2015, he issued and posted in the Times' pressroom a report informing Union members of upcoming CBA negotiations. *See* Heffernan Decl. at ¶ 12; Heffernan Decl. at Ex. 1; ("September 2015 stands as a crossroad for Local 2N/1SE. We have been negotiating and attempting to reach a contract extension at the Times for all 3 crafts for approximately 2 years with little success. . . . We continue to negotiate with 18 months left in our current CBA[ ]s."); *see also* Defs.' Rule 56.1 Statement at ¶ 53. In November 2015, he issued and posted a second report, informing members of the ratification of the CBA amendment and that he would not accept the $25,000 bonus to which he was entitled under the amendment. *See* Heffernan Decl. at ¶ 12; Heffernan Decl. at Ex. 2 ("As you are aware, after negotiating for well over two years an agreement was reached at The New York Times covering all of our members at the College Point Facility. . . . *I would also wish to clarify that although I am on Union leave at the Times and remain on appendix A with a lifetime guarantee, I have informed the Publisher that I will not accept the 25 thousand dollar bonus in the CBA. Our members at Times as well as outside members who seek extra work in College Point took a reduction and I feel it would be inappropriate* and that I as Chief negotiator, should share in my home chapel's sacrifice." (emphasis added)); *see also* Decl. of Vincent Reynolds, Mar. 30, 2017, ECF No. 25, at ¶10 ("I posted the Report of President Heffernan #82 on the Union bulletin boards in early September 2015. It remained there until it

was replaced by the Report of President Heffernan #83, which I posted on the Union bulletin boards at some point in November 2015."); Defs.' Rule 56.1 Statement at ¶ 54.

Plaintiffs argue that their duty of fair representation claims did not accrue until June 3, 2016, when they first saw a copy of the September 2015 MOA. They contend that the Union purposely prevented Casuals from learning about the CBA amendment in order to frustrate their plans to join the Union. Pls.' Mem. of Law in Opp'n to the Mot. for Summ. J., Apr. 10, 2017, ECF No. 27 ("Pls.' Opp'n Mem."), at 5-6, 10-12. According to plaintiffs, the posted notice and the Union President's reports were not in plain view, and plaintiffs were unaware that they should check the bulletin boards for updates. *Id.* at 4-5; Hr'g Tr., June 6, 2017 ("June 6 Hr'g Tr."), at 38:23-43:15. The Union had previously instructed Casuals that they would receive all messages in the shape room, but, it is claimed, failed to post or disseminate any copies of the MOA or ratified agreement in the shape room. Instead, all of the bulletin boards on which the copies and the reports were posted were located in the pressroom or a separate break room, to which Casuals did not have access on a regular basis. Pls.' Opp'n Mem. at 5-7; Pls.' Rule 56.1 Statement at ¶¶ 15-16. It is alleged that one of the pressroom bulletin boards is a "locked" display cabinet, and because the MOA was posted in such a manner that only the top page was visible, plaintiffs could not have read the entire document. Pls.' Rule 56.1 Statement at ¶ 16; Pls.' Opp'n Mem. at 6. Plaintiffs claim that the Union deliberately withheld this information in furtherance of their plan to prevent Casuals from becoming Union members. Pls.' Opp'n Mem. at 10. They did not become aware of the terms of the amendment until June 3, 2016, when Mr. Verrilli went to the NRLB and read portions of the amendment. *Id.* at 11-12, 16.

These plaintiffs' arguments are not factually correct as demonstrated in an evidentiary hearing before this court. *See generally* June 6 Hr'g Tr. Even if they were fact-based, they are

insufficient to show that plaintiffs did not know of the amendment before their time to file a lawsuit had expired under the statute of limitations. The emphasis of the inquiry is when plaintiffs "*knew* or reasonably *should have known* that such a breach of the duty of fair representation had occurred." *Kalyanaram*, 742 F.3d at 46 (emphasis in original).

Even assuming that plaintiffs did not know of the tiered wage structure until June 2016, when Mr. Verrilli reviewed the MOA and informed his co-plaintiffs, they reasonably *should* have known about it. During the three-month period in which the MOA was posted in the pressroom's bulletin boards, plaintiffs worked in the pressroom: they collectively worked 42 shifts. Defs.' Rule 56.1 Statement at ¶¶ 56-61; Pls.' Rule 56.1 Statement at ¶¶ 56-61; Heffernan Decl. at Ex. 7. If plaintiffs are correct that no material was posted or disseminated in the shape room, they collectively had 42 separate opportunities to inspect the bulletin boards and inquire into a copy posted in a display cabinet visible to all workers they claimed was locked. There is no proof that it was locked or that all pages were not in plain view; plaintiffs admitted they did not look or try to open the cabinet to examine the posted agreement. *See* June 6 Hr'g Tr. at 38:23-43:15.

Even assuming the Union had failed to properly disseminate information about the MOA ratification, plaintiffs should have asked why their wages had decreased. *Cohen*, 68 F.3d at 68 ("While . . . pinpointing an accrual date can be difficult when a union has been less than cooperative . . . [t]he inaction of the Union, while not commendable, does not permit the statute of limitations to be tolled."). Plaintiffs admit that they became aware of the decreases in their wages immediately following the ratification of the amendment, but failed to file a claim within six months of noticing the decrease. Pls.' Rule 56.1 Statement at ¶ 41 ("Plaintiffs were aware that their rates were reduced but they did not testify that their compensation was reduced to the Tier 3 Rate."); *see also* June 6 Hr'g Tr. at 39:4-11, 44:14-21. Plaintiffs essentially argue that they were aware of a change in

compensation, but did not know that it was attributable to the new tiered wage structure. This argument fails: the statute of limitations does not begin to toll once a plaintiff becomes aware of the actual terms of an agreement. It begins to toll when the plaintiff knew or *should have known* of its existence.

Plaintiffs' argument that they still have not received details about the benefits of Tier 1 recipients is irrelevant: they did not need to be aware of all terms of the agreement to trigger the tolling period. *See* Pls.' Opp'n Mem. at 6. Plaintiffs became aware of reductions to their wages in October 2015, at which point they reasonably should have inquired about these changes. They were on constructive notice that the terms of their employment had changed because of the new agreement. *Demchik*, 821 F.2d at 105 ("[T]he statute of limitations begins to accrue . . . when the employee had actual or *constructive* notice that the union has breached its duty of fair representation." (emphasis added)). Holding otherwise would allow aggrieved workers to deliberately avoid becoming aware of the entirety of an amendment in order to postpone operation of the statute of limitations. Plaintiffs must have also had actual knowledge: it is difficult to imagine that a person whose wages have significantly decreased would not reach out to co-workers or his superiors, read posted notices, or consult a Union member or the Union to inquire about to these changes for nearly eight months.

The court took judicial notice – without objection – that shortly before and during the negotiations, the newspaper industry – including the Times – was facing financial difficulty due to an ongoing shift from print to electronic form. *See* June 6 Hr'g Tr. at 16:18-17:17. Plaintiffs must have been aware of these changes and known that the resultant financial pressure might affect their working conditions under the CBA. The amendment was publicly discussed in a newspaper article published on October 9, 2015 in the New York Post, shortly after the ratification. *See* Keith

J. Kelly, *New York Times Extends Union Deals Through 2021*, N.Y. POST (Oct. 9, 2015), http://nypost.com/2015/10/09/new-york-times-extends-union-deals-through-2021/.

Fraudulently concealing a breach of duty of fair representation will extend the statute of limitations until plaintiff discovers the fraud. *Demchik*, 821 F.2d at 105. But in order to prove fraudulent concealment, plaintiffs must show that they acted diligently:

> Fraudulent concealment is predicated on a union deliberately misleading the plaintiff about a breach which he failed to discover during the limitations period despite the exercise of due diligence. Diligence proves to be a missing ingredient in this case, as there is no indication that [plaintiff] made any effort to determine the Union's stance on his termination.

*Cohen*, 68 F.3d at 69 (internal citation omitted). Plaintiffs in this case made no effort to inquire about the changes in their wages or consult the posted notices. They did not act diligently, and have not proven fraudulent concealment. Plaintiffs' argument that defendants deliberately kept them out of the negotiations process is irrelevant: plaintiffs were Casuals, not Union members, and only Union members had the right to participate in and vote on CBA amendments. Compl. at ¶¶ 33-38.

### B. State Law Claims

In addition to their DFR claim, plaintiffs allege that defendants are liable for breach of fiduciary duty, negligence, breach of good faith and fair dealing, and fraud. *See generally* Compl.

"Section 301 [of the NLRA] confers 'an especially broad jurisdiction' on the federal courts in actions involving collective bargaining agreements." *Nelson v. Local 1181-1061, Amalgamated Transit Union, AFL-CIO*, 652 F. App'x 47, 48 (2d Cir. 2016), *cert. denied sub nom. Nelson v. MV Transp.*, No. 16-cv-7966, 2017 WL 661914 (U.S. Apr. 17, 2017) (quoting *Wynn v. AC Rochester*, 273 F.3d 153, 157 (2d Cir. 2001)). "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims substantially dependent on analysis of a collective-bargaining agreement." *Nelson*, 652 F. App'x at 48-49 (internal quotation marks

omitted); *Franchise Tax Bd. v. Construction Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983) ("[T]he preemptive force of § 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization. Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." (internal quotation marks, citation, and footnote omitted)).

Plaintiffs' state law claims are preempted by section 301. Plaintiffs did not contest this rule in their opposition papers. The breach of fiduciary duty, negligence, breach of good faith and fair dealing, and fraud claims are premised on the same set of circumstances as is the duty of fair representation claim. *See* Compl. "[Plaintiffs'] claims were founded directly on rights created by [the CBA]." *Nelson*, 652 F. App'x at 49 (internal quotation marks and citation omitted). Because the duty of fair representation claim is untimely, and the state law claims are preempted by the duty of fair representation claim, plaintiffs' state law claims are dismissed.

## V. Conclusion

Defendants' motion for summary judgment is granted. The action is dismissed.

In view of the seriousness of plaintiffs' loss of income, no costs or disbursements are awarded.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

June 8, 2017
Brooklyn, New York

13